IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES FOR:

A SEARCH WARRANT FOR THE
RESIDENCE LOCATED AT 11838
JOAN DRIVE, PITTSBURGH, PA
15235

Magistrate No. 20-1755
**[UNDER SEAL]**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, Brianna Maria Tetrault, having being duly sworn, depose and state as follows:

1.      I, BRIANNA MARIA TETRAULT, am a Special Agent of Homeland Security Investigations (HSI) Immigration and Customs Enforcement (ICE), United States Department of Homeland Security.  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations of, and make arrests for, controlled substance offenses enumerated in Title 21, United States Code.

2.      I am currently assigned to the HSI Pittsburgh Office of the Assistant Special Agent in Charge in the Contraband Smuggling Group and have been so employed since June 2010.  As a Special Agent, I am authorized to conduct investigations of alleged violations of Immigration laws and Customs laws, including offenses involving the importation of prohibited items, such as narcotics, under Titles 18, 19, and 21 of the United States Code.  While being trained as a Special

Agent of the HSI, your affiant has received basic training at the Federal Law Enforcement Training Center located in Glynco, Georgia.  Your affiant has participated in a number of narcotics and money laundering investigations, which have resulted in the seizure of illegal drugs and evidence of drug violations, as well as the seizure of assets acquired with drug proceeds.  Your affiant has conducted covert surveillance of suspected drug traffickers on numerous occasions, interviewed numerous individuals involved in the drug trafficking trade, participated in a Title III wiretap investigation, participated in the execution of numerous search and arrest warrants, assisted in the arrest of narcotics traffickers, and assisted in the seizure of controlled substances.  Based upon the above experience, your affiant is familiar with the modus operandi of persons involved in illicit distribution of controlled substances.

3.      I make this affidavit in support of an application for a Search Warrant for the residence located at 11838 Joan Drive, Pittsburgh, PA 15235, (**"TARGET RESIDENCE"**).  The **TARGET RESIDENCE** is further described as a single-family red brick and white residence, with the front door at the center of the residence and a driveway at the left of the residence, leading to an integral garage in the rear of the residence. The number "11838" is written above the front door. There is a black mailbox to the right of the front door affixed to the brick.

4.       Your Affiant submits that there is probable cause to believe that evidence of the violations of Title 21 United States Code Section 846, Attempt (to possess with intent to distribute a quantity of narcotics) and/or Title 21, United States Code, Section 841, (possession with intent to distribute) will be found within the **TARGET RESIDENCE**.

2

5.      The facts and information contained in this affidavit are based upon my personal participation in this investigation and information provided by other law enforcement officers involved in this investigation.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      Information was reported to the HSI Tip Line in April 2020.  The tipster's initial report relayed there were two individuals from Jamaica presently moving kilogram quantities of cocaine, heroin, and marijuana at a home in the Penn Hills area of Pittsburgh.  The tipster further stated that s/he had known one of the individuals for a considerable number of years.  The tipster said that s/he had been involved in various drug transactions with the individuals at the **TARGET RESIDENCE** and was motivated by fear because of a recent incident related to the tipster's involvement in trafficking narcotics with the individuals associated with the **TARGET RESIDENCE**.  The specific drugs, quantities, and details of the recent incident are not discussed herein in order to protect the identity of the tipster.  The tipster relayed that one of the subjects lived at the **TARGET RESIDENCE** and the other frequented the **TARGET RESIDENCE.**  The tipster further said that s/he had been inside the **TARGET RESIDENCE** and seen kilogram quantities of cocaine, heroin, and marijuana numerous times inside the **TARGET RESIDENCE**.

7.      Your Affiant identified the **TARGET RESIDENCE** based on information provided by the tipster, i.e. the street name, an "ADT" security sign, and a surveillance camera positioned at

3

the front of the residence.[1]   Your Affiant was able to identify the address as 11838 Joan Drive, Pittsburgh, PA 15235, the **TARGET RESIDENCE**.

8.      Your Affiant was also able to identify the individual described by the tipster who the tipster stated lived at the **TARGET RESIDENCE**.  In the tip, the tipster knew and provided the real name of one of the subjects, but only provided a street name or nick name of the other subject.  Your Affiant was able to fully identify the first subject based on confirming the legal name provided by the tipster.   Your Affiant also learned that the two subjects had been previously arrested together, thereby identifying the other subject, identified by the tipster as the subject who lived at the **TARGET RESIDENCE** as JERMAIN WILLIAMS.  The tipster confirmed a photo of WILLIAMS to be the person s/he knew by the street name, residing at the **TARGET RESIDENCE,** and being involved in the above described narcotics trafficking.  Further, also based on tip line information, as well as other Department of Homeland Security database searches, your Affiant identified WILLIAMS as being previously deported back to Jamaica and appearing to not have any current status in the United States, in addition to having a criminal history with previous ties to the Western Pennsylvania and Pittsburgh areas.  In 2006, WILLIAMS pled guilty to felony drug distribution charges in Somerset County.  Further, WILLIAMS appears to have an active warrant for a weapons offense from "Sherriff's Office Pittsburgh" and is considered armed and dangerous.

---

[1] The tipster, along with the other identifying information for the **TARGET RESIDENCE**, did provide a numeric street address.  However, the home at the address provided by the tipster was across the street from the **TARGET RESIDENCE** and contained none of the other identifying characteristics such as the "ADT" security sign or the front door security camera.

4

9.     The tipster also relayed that WILLIAMS, who has a criminal weapons history, had been seen in possession of firearms.  The tipster also stated that WILLIAMS is in possession of a fraudulent Florida driver's license.   Additionally, your Affiant is aware from other similar investigations that Jamaicans, previously deported from the United States, oftentimes utilize Florida identifications using false or fictitious identities, perhaps because they may be easier to obtain than other states.  This information is due in part to having made or assisted with arrests of Jamaican subjects that have possessed Florida identifications in fake names coupled with the knowledge from another HSI Special Agent who investigate benefit fraud related to the Florida Department of Transportation.

10.     The tipster provided additional verifiable information, specifically that WILLIAMS, who the tipster stated resides at the **TARGET RESIDENCE**, drives a gray Audi with a PA license plate.  On August 4, 2020, your Affiant observed a gray/silver Audi back down the driveway of the **TARGET RESIDENCE.**  Your Affiant has observed the Audi at the **TARGET RESIDENCE** a total of three times from August 4 to August 7, 2020, and the PA license plate for the Audi is registered to an individual known to your Affiant as being affiliated with WILLIAMS.

11.     On August 5, 2020, your Affiant conducted a "trash pull" at the **TARGET RESIDENCE**.  Several black trash bags with blue ties were observed at the end of the driveway, near the road.  Your Affiant made contact with the sanitation truck driver and after displaying her identification, explained her request to retrieve the trash from the **TARGET RESIDENCE**.  Your Affiant watched as the trash truck cleaned his hopper and then stopped in front of the **TARGET**

5

**RESIDENCE.**  The driver collected the trash.  Your Affiant met the driver a little ways from the **TARGET RESIDENCE** and collected the same trash bags at approximately 1127 hours.

12.   Your Affiant transported the trash bags to the Penn Hills Police Department to review the contents.  While looking through the bags of trash, your Affiant observed cans of Jamaican-made food products, bills and mailers addressed to the **TARGET RESIDENCE**, with some addressed to "Jacquilyn Rush," including one from the company that owns the **TARGET RESIDENCE**. Through a search of the Allegheny County Real Estate website, your Affiant identified the current owner (company) of the **TARGET RESIDENCE** and located mail in the above listed trash pull from the company to Rush, the presumed renter.

13.   Your Affiant also discovered the apparent connection between Rush (the named renter of the TARGET RESIDENCE) and WILLIAMS (the suspected resident of the **TARGET RESIDENCE**).  Your Affiant believes that WILLIAMS is likely the father of one of Rush's children through a search of various Facebook public profiles, including Rush's.  Also through a search of Rush's Facebook profile, it appears as though Rush maintains a life separate from WILLIAMS and the **TARGET RESIDENCE** and does not appear to live at the **TARGET RESIDENCE**, as her PA driver's license lists her at another address in Pennsylvania and Facebook shows that she is married to someone other than WILLIAMS.  Your Affiant believes that Rush rents the **TARGET RESIDENCE** for WILLIAMS so that he may remain in the country illegally and avoid law enforcement detection that may result if he (WILLIAMS) rented the property using his own name. Based on your Affiant's training and experience, she knows that those individuals who have been

6

deported from the United States and then re-enter, oftentimes utilize fictitious names and/or have other people, commonly a paramour (here, Rush), register and rent houses and cars for their use, so they cannot be easily identified by law enforcement.

14.     Your Affiant also discovered several items indicative of drug trafficking during the August 5th "trash pull."  Your Affiant recovered several knotted plastic baggie corners and plastic baggie corner pieces.  The corner pieces are the bottom corners of Ziplock or other similar clear plastic sandwich baggies that have been cut off, ripped, or otherwise removed from the rest of the sandwich baggie and are used in the drug trade to store narcotics.  Some of the baggie pieces had a dark brown or black sticky residue, which your Affiant is aware could be a drug or a cutting or a masking agent.  Based on your Affiant's experience, these baggie pieces and knotted corners are consistently used in the drug trade.  All of the aforementioned items were photographed and discarded and the baggie pieces were transported to HSI Pittsburgh.  These baggie pieces also emitted a strong chemical odor.

15.     On August 6, 2020, your Affiant utilized a cocaine field test kit[2] and tested the residue from the inside of some of the baggie pieces obtained from the "trash pull."  Your Affiant swabbed the inside of some of the baggie pieces and obtained a presumptive positive result for cocaine.  This was done in the presence of HSI SA Dave Coleman.

---

[2] Alternatively, a specific residue test kit is sometimes utilized in these situations but a residue test kit was not available.  Nevertheless, a presumptive positive result was obtained with a cocaine field test kit, which indicated that the substance found inside the baggie corners (which alone are indicative of drug distribution or personal use) also contained cocaine.

7

16.     Your Affiant also recognizes that ripped plastic baggie corners are consistent with the use of packaging narcotics and thus, the plastic baggie corners and knotted plastic baggies, alone, constitute evidence of narcotics distribution or personal use. During the process of packaging narcotics for distribution, specifically heroin, cocaine, and marijuana, traffickers place and tie loose narcotics in a secure fashion in the lower corners of a baggie which are severed from the rest of the bag, creating a "diaper" shape of the remaining baggie.  Consequently, the presence of a ripped plastic baggie corner or knotted plastic baggies in the trash is indicative of the packaging of narcotics for the purposes of eventual distribution rather than mere use of a controlled substance.

17.     On August 19, 2020, your Affiant and HSI Task Force Officer (TFO) Joe Timms conducted a second trash pull at the **TARGET RESIDENCE**.  The trash was again observed at the end of the driveway for pickup.  When your Affiant observed the trash truck in the area, she displayed her identification to the sanitation workers therein and explained from which residence investigators were seeking the trash.  Your Affiant then observed as the trash truck cleaned its hopper prior to picking up the trash from the **TARGET RESIDENCE**.  The trash was then retrieved from the **TARGET RESIDENCE** at approximately 1214 hours.  Your Affiant and TFO Timms then met the sanitation workers and retrieved the bags.

18.     Your Affiant transported the bags of trash to the Penn Hills Police Department in order to go through the bags of trash.  While going through the bags of trash, items of indicia were located addressed to the **TARGET RESIDENCE**.  Your Affiant also discovered additional drug paraphernalia during the August 19th "trash pull."  The following items were located in the trash

8

from the **TARGET RESIDENCE** during the August 19th "trash pull" – (i) a bag filled with

capsules containing an unknown white powder, where many of the capsules had opened and had

mixed with the trash; (ii) an empty marijuana wrapper called "Exoticxxs," which further said in part

on the wrapper, "This product contains cannabis, a schedule 1 controlled substance…;" (iii) a small

plastic bag that your Affiant and TFO Timms believe contained marijuana stems based on their

training and experience; and (iv) another ripped baggie corner and a tied off baggie corner were also

located.  Photos were taken of these items.  As noted above, the baggie corners and tied off baggie

pieces, alone, are evidence of the presence of narcotics and/or narcotics distribution as described

above.

19.     Based on the above, including but not limited to (i) drug paraphernalia discovered

during two trash pulls conducted in August 2020; (ii) the identification of a suspected occupant

(WILLIAMS) with a history of felony drug distribution; and (iii) information supplied by a tipster

with personal knowledge that drugs were present and distributed from the **TARGET**

**RESIDENCE**,[3] your Affiant believes that the **TARGET RESIDENCE** contains evidence related to

violations of  21 U.S.C. § 841 and/or attempt and conspiracy related to the same.  Based on the

---

[3] *See United States v. Jackson*, Crim. No. 18-217, 2019 WL 1116913 (W.D. Pa. Mar. 11, 2019)
(Conti, J.) (upholding finding of probable cause for search warrant of a residence where affidavit
contained evidence from multiple trash pulls, including plastic baggie corners, "baggie diapers,"
and cocaine residue inside the baggies and evidence that individuals resided at the address who
had prior drug convictions); *see also United States v. Miller*, 134 F. App'x 531, 533 (3d Cir.
2005) (upholding warrant based on an affidavit reflecting a trash pull that recovered baggies field
tested positive for cocaine and resident was previously arrested for a drug violation).

above-mentioned information, this officer respectfully requests that a search warrant be granted for the **TARGET RESIDENCE**, 11838 Joan Drive, Pittsburgh, PA 15235.

## ITEMS TO BE SEARCHED FOR AT TARGET RESIDENCE

20.     Based on the above, I believe that the following items, documents and records constitutes fruits and evidence relating to the distribution of narcotics into Pennsylvania contrary to law, may be found at the **TARGET RESIDENCE** such as narcotics inside the residence, evidence of narcotics packaging paraphernalia, communications, and other paperwork that will provide additional evidence concerning drug trafficking.  Based on my training and experience, cocaine is not manufactured in Pennsylvania and is transported into the Commonwealth from out-of-state.  Further, based on my training and experience, your Affiant believes there will be cash proceeds also at the **TARGET RESIDENCE**.

21.     Your Affiant also believes that, included among these items that may be additional evidence of drug distribution, including money laundering related to the same, as detailed in Attachment A and Paragraphs 23 to 35, *infra*.

## PROBABLE CAUSE TO BELIEVE EVIDENCE OF THE ENUMERATED OFFENSE(S) MAY BE FOUND AT THE TARGET RESIDENCE

22.     Your Affiant incorporates the facts, evidence, and investigation referenced above in Paragraphs 6 through 19 regarding probable cause to support a search of the **TARGET RESIDENCE**.

23.     In a substantial number of residential searches executed in connection with the drug investigations in which I and fellow HSI Agents and State Police Officers have been involved, the

10

following kinds of drug-related evidence have typically been recovered from the residences of drug-traffickers:

· Controlled substances, such as marijuana, heroin, crack cocaine, powder cocaine, and synthetic narcotics, such as fentanyl;

· Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

· Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

· Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

· Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union), cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

· Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

11

- Mobile electronic communication devices, such as cellular telephones and "smart phones", electronic messaging equipment, such as tablets, pagers, telephones answering machines, and their tapes, electronic storage devices, such as GPS devices and portable media players, and other such mobile electronic devices that store data, as well as the content therein;

· Firearms and other dangerous weapons; and

· Photographs, in particular, photographs of co-conspirators, assets, and/or drugs.

24.     In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, utility and telephone bills, statements, identification documents, and keys to safe deposit boxes and storage facilities.

25.     Based upon my training and experience, as well as the knowledge and experience of other agents and police officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences.  As described above, the tipster stated that he/she had seen multiple types of drugs at the **TARGET RESIDENCE**.  Further, it is generally a common practice for drug traffickers to maintain in their residence(s) and/or their business records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled

substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

26.     Based upon my training and experience, I also am aware that it is a generally common practice for traffickers to conceal at their residences and/or their business large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers must maintain on hand the large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or their business.

27.     Based upon my training and experience, that drug traffickers commonly have in their possession that is on their person, at their residences and/or their business, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. I also am aware that, typically, drug traffickers possess these firearms and other dangerous weapons to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take

13

the traffickers' profits and/or supply of drugs.  As described above, the tipster relayed that WILLIAMS had been seen in possession of firearms.  In addition, as described above, it appears that WILLIAMS may have an active arrest warrant related a firearms charge.

28.     Further, I am aware that narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles.

29.     Further, I am aware that persons involved in significant drug trafficking, conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities.

30.     When drug traffickers amass proceeds from the sale of drugs, drug traffickers often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, drug traffickers often use different techniques, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds.

14

31.     Further, I am aware that narcotic traffickers commonly maintain books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; that narcotic traffickers take or cause to be taken photographs of them, their associates, their property, and their product; and that these traffickers usually maintain these photographs in their possession.

32.     Further, I am aware that narcotic traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and the paraphernalia would include, but are not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution.  As described above, paraphernalia has already been discovered in multiple trash pulls from the **TARGET RESIDENCE** trash bins.

33.     Further, I am aware that narcotic traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names; and that they maintain such documents as evidence of their false identities in their residences, businesses, and automobiles together with evidence of their true identities.  As described above, the tipster has stated that WILLIAMS possesses a fraudulent Florida driver's license.

34.     I have knowledge that drug traffickers commonly conceal their activities from members of the public by transacting their business in a convert manner and frequently conducting their business during the nighttime hours when darkness helps conceal their activities. Moreover, it is

highly unusual for individuals primarily engaged in drug trafficking activities to associate in their businesses or social activities with others not engaged in the same drug trafficking activities.

35.     I have knowledge that it is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or their business, for their ready access and to conceal them from law enforcement authorities.

36.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following:

a.  My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

b.  My involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations;

c.  Discussion with other members of HSI and law enforcement officers, both about the facts of this case in particular and about trafficking in general;

d.  Other intelligence information provided through law enforcement channels.

37. Because this investigation is ongoing, it is further respectfully requested that this application and any warrant or order issued thereon be ordered sealed until further notice.

The above information is true and correct to the best of my knowledge, information and belief.

s/ *Brianna M. Tetrault*
Brianna M. Tetrault
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me
this 27th day of August 2020.

HONORABLE LISA PUPO LENIHAN
United States Magistrate Judge

17

## ATTACHMENT A

*Property to be seized from the property described on the search warrant face sheet*

The following items to be seized constitute evidence, fruits, proceeds, and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a) (conspiracy to distribute, and unlawful distribution of controlled substances), including:

1)    controlled substances, such as heroin, cocaine, methamphetamine, and marijuana;

2)    paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags", microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3)    books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4)    personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

5)    cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers,

18

cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6)        documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7)        computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)        firearms and other dangerous weapons; and

9)        identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to

19

identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.